UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

LEHIGH TECHNOLOGIES, INC., in its
own capacity and as successor-in-
interest to LEHIGH TECHNOLOGIES,
LLC,

              Plaintiff,

vs.                        Case No.  2:08-cv-53-FtM-29SPC

WILLIAM J. FARRAH, TITAN POLYMERS,
LLC, and THE FARRAH GROUP, LLC,

              Defendants.

_____

**OPINION AND ORDER**

This matter comes before the Court on defendants William J.
Farrah, Titan Polymers, LLC and The Farrah Group, LLC's Motion
for Dismissal Under FED. R. CIV. P. 12(b)(2) and (3) or, in the
Alternative, Motion to Transfer Venue (Doc. #65).  Defendants
seek to dismiss the Amended Complaint (Doc. #60) for lack of
personal jurisdiction or, in the alternative, seek to transfer
venue to the United States District Court for the Eastern
District of Michigan.  Plaintiff Lehigh Technologies, Inc. filed
a Response in Opposition to Defendants' Motion for Dismissal and
Motion to Transfer Venue (Doc. #70). Plaintiff argues that the
Court has personal jurisdiction, that agreements between the
parties contain binding, exclusive forum selection clauses, and

that venue is proper in Florida.  For the reasons set forth below, the Court concludes that defendants' motion to dismiss and motion to transfer venue should be denied.

## I.

Plaintiff Lehigh Technologies, Inc., in its own capacity and as successor-in-interest to Lehigh Technologies, LLC ("Lehigh"), filed a nine-count Amended Complaint (Doc. #60) against defendants William J. Farrah ("Farrah") (individually and as agent for Titan Polymers, LLC and The Farrah Group, LLC), Titan Polymers, LLC ("Titan Polymers"), and The Farrah Group, LLC (the "Farrah Group"), alleging the following causes of action against all defendants: Trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (2006), and Florida common law (Count I); breach of contract (Count II); breach of implied covenant of good faith and fair dealing (Count III); tortious interference with advantageous business relations (Count IV); misappropriation of trade secrets and confidential information in violation of the Florida Uniform Trade Secrets Act, FLA. STAT. § 688.001, *et seq.*, and Florida common law (Count V); violation of the Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. § 501.201, *et seq.* (Count VI); deceptive business practices and false representations (Count VII); promissory

estoppel (Count VIII); and civil conspiracy (Count IX). The Amended Complaint sets forth the following facts:

Plaintiff Lehigh Technologies, Inc.[1] is a Delaware corporation with its principal place of business in Naples, Florida. Defendants Titan Polymers and the Farrah Group are Michigan limited liability companies, whose sole two members are defendant William J. Farrah and his wife, Janice Swift Farrah ("Swift Farrah"). Both Farrah and Swift Farrah are citizens of Michigan. Farrah is also Manager of Titan Polymers. (Doc. #60, ¶¶ 1-4.)

Plaintiff Lehigh engages in the business of "recycl[ing] scrap tire material by freezing and pulverizing it into reusable, ultra-fine engineered rubber powder," using processes and compositions protected by U.S. patents and process trade secrets, thereby producing a trademarked "novel propriety composition" called PolyDyne®. (Id. at ¶ 6.) Lehigh creates PolyDyne® by using a variety of specialized proprietary methods that are not available in the public domain. (Id. at ¶ 7.) PolyDyne® is an economically and environmentally beneficial product with "wide

---

[1]Lehigh Technologies, Inc. is successor-in-interest to Lehigh Technologies, LLC, a former Delaware limited liability company with its principal place of business in Naples, Florida.

application in commercial uses, particularly in the automotive industry." (Id.)

In early 2007, defendant Farrah contacted Lehigh by telephone at Lehigh's corporate office in Florida to seek a supply of PolyDyne® in connection with a prospective business opportunity involving the manufacture and sale of wheel-well barriers to General Motors Corporation ("GM") (the "GM Deal"). At the time, this opportunity was known in the marketplace and was being independently evaluated and pursued by Lehigh. (Id. at ¶ 8.) In their conversations, Farrah represented that he had the necessary technical expertise, manufacturing capabilities and strategic business contacts within GM to embark on a highly profitable collaborative venture with Lehigh. (Id. at ¶¶ 8-10.) Farrah claimed to have developed a formula and process to commercially produce a compatibilized rubber product, and claimed to possess functional technology for combining that rubber product with polymers to produce a turn-key, functional product for GM. (Id. at ¶ 9.) Specifically, Farrah made the following representations: (i) he had highly-placed personal contacts and relationships with key decisionmakers in GM as to the proposed product (wheel-well barriers); (ii) he could assist in presenting Lehigh's rubber products to GM; (iii) he controlled a formula for

a commercially viable product that would incorporate PolyDyne®; (iv) he controlled a compatibilizer to use with PolyDyne®; (v) he controlled a workable method to combine PolyDyne® with the compatibilizer; (vi) he controlled industry-standard certified facilities to produce the proposed product in commercial volume, of a quality and quantity meeting GM's specifications; (vii) he had obtained financing; (viii) he had completed testing; and (ix) he could easily obtain GM approvals based on all of the above factors.  (<u>Id.</u> at ¶ 10.)  Farrah indicated that he only needed Lehigh to supply their PolyDyne® product and that Lehigh could anticipate a projected revenue of at least One Hundred Million Dollars ($100,000,000) per year, with at least ten percent (10%) of that amount constituting profit.  (<u>Id.</u> at ¶ 9.)

Based on Farrah's representations, Lehigh entered into a mutual Confidentiality Agreement with the Farrah Group on March 13, 2007.  (<u>See</u> Doc. #60-2.)  The agreement was executed by Farrah on behalf of the Farrah Group, was signed by the parties via facsimile from their respective offices in Florida and Michigan, and contained a provision specifying that the contract was to be governed by Florida law.  (<u>See id.</u>; Doc. #60, ¶ 11.)  With the agreement in place, Lehigh disclosed to the Farrah Group its confidential business information, opportunities,

technologies, and proprietary processes; among other things, a top technical executive of Lehigh presented to Farrah an "Executive White Paper" dated October 2, 2007, which contained specific confidential information. (Doc. #60, ¶ 11.)

On July 10, 2007, in furtherance of the GM Deal, Lehigh and Titan Polymers entered into a Confidential Non-Disclosure Agreement. (See Doc. #60-3.) The agreement was executed by Farrah on behalf of Titan Polymers and was signed by the parties via facsimile from their respective offices in Florida and Michigan. The Non-Disclosure Agreement did not contain governing law or forum selection clauses. (See id.; Doc. #60, ¶ 12.) According to plaintiff, the purpose of the Non-Disclosure Agreement was to "continue to explore the business opportunities based on Farrah's representations to Lehigh that Farrah and his affiliates were in the final stages of a deal with GM." (Doc. #60, ¶ 12.)

In August 2007, Lehigh met with Farrah in a series of meetings in Michigan, during which Farrah reiterated his prior representations and further stated that he was finalizing the GM Deal, subject only to procurement of a suitable rubber product. (Id. at ¶ 13.) In the fall of 2007, Lehigh began to develop and test its product in anticipation of completing the GM Deal.

Meanwhile, Farrah continued to reaffirm his prior representations and to make new ones, such as claiming that he owned several patents related to compatibilized rubber and polymers. (Id. at ¶ 14.)

At or around the same time, information contrary to Farrah's representations slowly began to materialize. Upon initial questioning by Lehigh, Farrah's claims of owning intellectual property as to polymerizing rubber particles began to appear unsupported, as did his claimed methods of mixing and reactively integrating rubber and polymers. (Id. at ¶ 15.) Farrah also stated that "his ability to execute on the GM [Deal] was impaired due to his advanced age," and indicated in September 2007 that he would prefer to sell his overall business to Lehigh rather than to complete their deal as planned. (Id. at ¶¶ 15-16.) Lehigh, suspecting that Farrah did not in fact have a near-final product as claimed, paid for extensive product testing and hired external consultants to develop the final product for the GM Deal.

In late November and early December 2007, Lehigh began to realize that a vast majority of Farrah's representations as to the GM Deal were false, but attempted to proceed in good faith. (Id. at ¶¶ 17-18.) Eventually, Lehigh learned that a majority of Farrah's representations were patently false and that Farrah and

his entities were seeking access to and use of Lehigh's intellectual property, expertise, financing, and business opportunities for their own benefit. (Id. at ¶ 19.) When Lehigh confronted Farrah in November 2007, Farrah demanded that Lehigh "buy Farrah out" of the GM Deal, beginning with an up-front payment of several hundred thousand dollars, and further claimed to own undisclosed proprietary information. (Id. at ¶ 20.) The parties failed to reach an agreement or to complete the GM Deal, and Lehigh's opportunity with GM has since been frustrated. (Id. at ¶ 22.)

At approximately the same time that the parties were involved in the GM Deal, Farrah (acting on behalf of his affiliated company, Titan Polymers) also contacted Lehigh about a business opportunity involving Titan International, Inc. ("Titan International") (no relation to Titan Polymers), a company that manufactures wheels and tires for the automotive industry. (Id. at ¶ 23.) Under the Titan Agreement, entered into on November 15, 2007, Lehigh would sell PolyDyne® products to Titan International and Titan Polymers would receive a commission on each sale (the "Titan International Deal"). (See Doc. #60-4.) Titan International was and is currently supplied with rubber products by a competitor of Lehigh, Edge Rubber. Lehigh believed

that it would have been able to provide a comparable product to Edge Rubber's product, at a profit of approximately One Million Five Hundred Thousand Dollars ($1,500,000) per year. (Doc. #60, ¶ 25.) The Titan Agreement, which among other things prohibits Titan Polymers from circumventing Lehigh or making direct contact with Titan International, is governed by Florida law and contains the following forum selection cause:

> Exclusive jurisdiction and venue for any litigation arising under this Agreement is in the federal and state courts located in Florida having jurisdiction over Lehigh's offices, and both parties hereby consent to such jurisdiction and venue for this purpose.

(See Doc. #60-4.) The agreement was executed by Farrah on behalf of Titan Polymers and was signed by the parties via facsimile from their respective offices in Florida and Michigan. (See id.)

As in the GM Deal, Farrah made representations to Lehigh that he had highly-placed contacts within Titan International (including the Chief Executive Officer) through which he could help Lehigh to present and sell PolyDyne® products to Titan International. (Doc. #60, ¶¶ 27-28.) Plaintiff claims that Farrah took the following actions as to the Titan International Deal: (i) he directly approached Titan International, in contravention of the Titan Agreement; (ii) he approached Titan International along with a direct competitor of Lehigh, Edge

Rubber; (iii) he misappropriated Lehigh's confidential information; and (iv) he made false and defamatory statements about Lehigh and its executive officers to others, such as claims that various officers were "personally dishonest," were "bankrupting" Lehigh, and that certain officers were in the process of leaving Lehigh to work for Farrah's affiliated companies. (Id. at ¶ 29.) Lehigh also claims that Farrah and defendants: breached contractual obligations; fraudulently induced Lehigh to share its intellectual property with Farrah; made unsubstantiated claims that Lehigh's intellectual property is available in the public domain; violated the covenant of good faith inherent in all three contracts; made unsubstantiated claims that Farrah owns relevant intellectual property; sought to use improper means to monopolize an area of commerce and pricing in an impermissible fashion; and on information and belief, directly approached customers and business opportunities to cause intentional, direct, and substantial interference with Lehigh's business relationships and intellectual property. (Id. at ¶¶ 30-35.) Lehigh also alleges that defendants have recently made numerous written threats of litigation to parties external to Lehigh, such as existing and potential business associates, third-party technical consultants and a venture capital firm that

has previously funded, and was in the process of funding, Lehigh. (<u>Id.</u> at ¶¶ 36-37.)

## II.

The applicable legal standards for considering issues of personal jurisdiction have been summarized in <u>Nippon Credit Bank, Ltd. v. Matthews</u>, 291 F.3d 738, 746-48 (11th Cir. 2002), <u>Meier v. Sun Int'l Hotels, Ltd.</u>, 288 F.3d 1264, 1269 (11th Cir. 2002), and <u>D.W. Mercer, Inc. v. Valley Fresh Produce, Inc.</u>, 146 F. Supp. 2d 1274, 1276 (M.D. Fla. 2001). In brief, the Court first determines whether defendants' activities satisfy the Florida long-arm statute, and if so, whether the extension of jurisdiction comports with the due process requirements of the Fourteenth Amendment. <u>See, e.g.</u>, <u>Meier</u>, 288 F.3d at 1269. As the Eleventh Circuit recently stated: "A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements. If both Florida law and the United States Constitution permit, the federal district court may exercise jurisdiction over the nonresident defendant." <u>Licciardello v. Lovelady</u>, 544 F.3d 1280, 1283 (11th Cir. 2008) (citations omitted).

## A.  The Florida Long-Arm Statute:

Plaintiff asserts that a state court in Florida could exercise jurisdiction over defendants because defendants "commit[ed] a tortious act within this state" within the meaning of FLA. STAT. § 48.193(1)(b), and "breach[ed] a contract in this state by failing to perform acts required by the contract to be performed in this state" within the meaning of FLA. STAT. § 48.193(1)(g).  Defendants argue that their activities do not satisfy the Florida statute because "no [d]efendant is a resident of Florida, is licensed to do business in Florida, has an office in Florida, owns any property in Florida, has sold any products in Florida, or employed any agents or representatives to act on its or his behalf in Florida."  (Doc. #65, p. 3; see also Doc. #23.)  Defendants reduce their contacts with Florida to "a few faxes and letters between [d]efendants in Michigan and Lehigh in Florida."  (Doc. #65, p. 4.)

### (1) Committing a Tortious Act:

Florida Statute Section 48.193(b) "permits jurisdiction over the nonresident defendant who commits a tort outside of the state that causes injury inside the state."  Licciardello, 544 F.3d at 1283 (citing Posner v. Essex Ins. Co., 178 F.3d 1209, 1216 (11th Cir. 1999)).  An out-of-state defendant's physical presence in

Florida is not necessarily required. Rather, "'committing a tortious act' in Florida under section 48.193(1)(b) can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida," as long as the cause of action arises from those communications. Wendt v. Horowitz, 822 So. 2d 1252, 1260 (Fla. 2002); see also Acquadro v. Bergeron, 851 So. 2d 665 (Fla. 2003)(same).

The Amended Complaint alleges in Counts I, IV, V, VI, VII and IX that Farrah committed a variety of tortious acts (on his own behalf and on behalf of the Farrah Group and Titan Polymers) from Michigan, which injured Lehigh in Florida. Among other things, Lehigh claims that Farrah made numerous misrepresentations from Michigan to Lehigh in Florida by telephone and fax, engaged in tortious interference with Lehigh's business relations by sending defamatory and threatening letters to third parties in other states (such as Michigan, Texas, and South Carolina), misappropriated Lehigh's trade secrets, and engaged in unfair competition and trademark infringement in violation of the Lanham Act.[2] Defendants deny the veracity of

_____

[2]See, e.g., Williams Elec. Co. v. Honeywell, Inc., 854 F.2d 389, 394 n.5 (11th Cir. 1988) (citing Bangor Punta Operations, Inc. v. Universal Marine Co., 543 F.2d 1107, 1109 (5th Cir. 1976) (finding violation of Lanham Act may constitute federal tort of unfair competition)).

some of these allegations but do not deny engaging in telephone and fax communications into Florida regarding the activities set forth in the Amended Complaint.  Lehigh has adequately alleged the elements of the torts named in Counts I, IV, V, VI, VII and IX, and has alleged that defendants' actions relating to these counts have caused harm to Lehigh in Florida.  Thus, the Court concludes that plaintiff has satisfied the Florida long-arm statute as to Counts I, IV, V, VI, VII and IX.

**(2) Breaching a Contract:**

Section 48.193(1)(g) "permits Florida courts to have jurisdiction over a non-resident when that party, 'breach[es] a contract in this state by failing to perform acts required by the contract to be performed in this state.'" See <u>Future Tech. Today, Inc. v. OSF Healthcare Sys.</u>, 218 F.3d 1247, 1250 (11th Cir. 2000) (per curiam).  Here, Lehigh alleges that defendants breached the three agreements named in the Amended Complaint (the Confidentiality Agreement, Confidential Non-Disclosure Agreement and Titan Agreement) when they engaged in acts such as disclosing Lehigh's confidential business information and intellectual property to third parties, appropriating Lehigh's intellectual property for themselves, approaching competitors of Lehigh, and making false promises and misrepresentations to Lehigh.  (<u>See</u>

Doc. #60, pp. 16-19, 24-25.)    The nature of the types of
contractual breaches alleged against defendants, in Counts II,
III and VIII, are essentially similar to and substantially
overlap the tortious activities alleged against them in the
remaining counts.    The Court finds that Lehigh has adequately
alleged that defendants breached the three agreements for
purposes of satisfying Florida's long-arm statute.    See, e.g.,
Future Tech., 218 F.3d at 1250 (assuming, *arguendo*, that alleged
non-payment of amount due under contract by out-of-state
defendant constituted breach of agreement in Florida satisfying
48.193(1)(g)).    Thus, the Court concludes that plaintiff has
satisfied the Florida long-arm statute as to the contractually-
based allegations in Counts II, III and VIII.

   **B.  Constitutional Due Process:**

   While the Florida long-arm statute has been satisfied, the
Court must determine if exercising personal jurisdiction over the
defendants would comport with the due process requirements of the
Fourteenth Amendment.    See, e.g., Meier, 288 F.3d at 1269.    As
the Eleventh Circuit has summarized:

>      Even though a statute may permit a state to assert
> jurisdiction over a nonresident defendant, the due
> process clause of the United States Constitution
> protects an individual's liberty interest in not being
> subject to the binding judgments of a forum with which
> he has established no meaningful "contacts, ties, or

relations." The Constitution prohibits the exercise of
personal jurisdiction over a nonresident defendant
unless his contact with the state is such that he has
"fair warning" that he may be subject to suit there.
This "fair warning" requirement is satisfied if the
defendant has "purposefully directed" his activities at
residents of the forum, and the litigation results from
alleged injuries that "arise out of or relate to" those
activities. In this way, the defendant could have
reasonably anticipated being sued in the forum's courts
in connection with his activities there.

Even where a defendant has purposefully established
constitutionally significant contacts within the forum
state, jurisdiction must also be evaluated in light of
several other factors to determine whether its exercise
would comport with "fair play and substantial justice."
These factors include the burden on the defendant of
litigating in the forum, the forum's interest in
adjudicating the dispute, the plaintiff's interest in
obtaining convenient and effective relief and the
judicial system's interest in resolving the dispute.
Where these factors do not militate against otherwise
permitted jurisdiction, the Constitution is not
offended by its exercise.

Therefore, in order to determine whether the due
process clause permits the exercise of personal
jurisdiction over Lovelady, we must assess whether he
has purposefully established such constitutionally
significant contact with the state of Florida that he
could have reasonably anticipated that he might be sued
here in connection with those activities. If so, we
must consider whether the forum's interest in this
dispute and the plaintiff's interest in obtaining
relief are outweighed by the burden on the defendant of
having to defend himself in a Florida court.

Licciardello, 544 F.3d at 1284 (internal citations omitted).

**(1) Defendants' Contacts With Florida:**

The Court concludes that plaintiff has sufficiently alleged the existence of the necessary jurisdictional requirements in its Amended Complaint.  First, defendants' purported contacts with Florida clearly arise from the causes of action alleged in plaintiff's Amended Complaint.  Second, defendants purposefully availed themselves of the privilege of conducting activities within Florida.  Specifically, the Amended Complaint alleges that Farrah, acting on behalf of himself and defendants (affiliate companies consisting solely of himself and his wife), personally reached out to Lehigh, initiating and maintaining contact with plaintiff by telephone at plaintiff's corporate offices in Florida (Doc. #60, ¶8).  Plaintiff further claims that while some meetings took place in Michigan, "the majority of the communications and agreements were done by telephone calls, facsimile transmissions, and letters between each party's respective resident state of Florida and Michigan."  (Doc. #29, p. 3.)  Defendants do not dispute these facts, but argue that they are insufficient to confer personal jurisdiction.  (Doc. #21, p. 6.)  Pertaining to this issue, the United States Supreme Court has stated:

> [I]t is an inescapable fact of modern commercial life
> that a substantial amount of business is transacted

solely by mail and wire communications across state
lines, thus obviating the need for physical presence
within a State in which business is conducted. So long
as a commercial actor's efforts are "purposefully
directed" toward residents of another State, we have
consistently rejected the notion that an absence of
physical contacts can defeat personal jurisdiction
there.

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985). Third,

as discussed above, at least some of defendants' activities

clearly were "purposefully directed" at plaintiff in Florida, and

therefore defendants should reasonably anticipate the possibility

of being haled into court in Florida. See Burger King, 471 U.S.

at 472-73 ("'fair warning' requirement is satisfied if the

defendant has 'purposefully directed' his activities at residents

of the forum."); Williams, 854 F.2d at 392 (citations omitted)

(same). Thus, the Court finds that defendants possess at least

minimum contacts with this forum to satisfy due process

requirements.

**(2) Fair Play and Substantial Justice:**

Even where a defendant has purposefully established

constitutionally significant contacts within the forum state,

jurisdiction must further be evaluated in light of several other

factors to determine "whether the extension of jurisdiction

comports with traditional notions of fair play and substantial

justice under the principles established in International Shoe

and its progeny." Meier, 288 F.3d at 1276 (citing Posner, 178 F.3d at 1221); see also Licciardello, 544 F.3d at 1284. In determining whether jurisdiction would comport with traditional notions of fair play and substantial justice, the court looks at factors such as: the burden on the defendant of litigating in the forum, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. Meier, 288 F.3d at 1276 (citing Future Tech., 218 F.3d at 1251). See also Burger King, 471 U.S. at 476; Licciardello, 544 F.3d at 1288. "Where these factors do not militate against otherwise permitted jurisdiction, the Constitution is not offended by its exercise." Licciardello, 544 F.3d at 1284 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980)).

The Court must "consider whether the forum's interest in this dispute and the plaintiff's interest in obtaining relief are outweighed by the burden on the [defendants] of having to defend [themselves] in a Florida court." Licciardello, 544 F.3d at

1284. The Court finds persuasive Lehigh's assertions on this matter. Lehigh argues that Florida has an interest in resolving defendants' continuing disregard of their contractual commitments and undertakings. (See Doc. #70, p. 15.) The Court also recognizes that "Florida has a very strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in Florida." See Licciardello, 544 F.3d at 1288. Lehigh indicated that its counsel has accommodated defendants thus far by traveling to Michigan for depositions, that defendants have failed to present any arguments as to why it would be burdensome for them to defend the action in Florida, and that any such burdens would be slight. (See Doc. #70, p. 15 (citing M.D. Fla. L.R. 3.01(i) (encouraging use of telephonic hearings and conferences, whenever possible, particularly when counsel are located in different cities)).) See also Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 259 (11th Cir. 1996) ("The burden on the defendants occasioned by litigating outside of Michigan is not slight, but modern methods of transportation and communication reduce this burden significantly."). Also, the Eleventh Circuit has held that a "Florida plaintiff, injured by the intentional misconduct of a nonresident expressly aimed at the Florida plaintiff, is not

required to travel to the nonresident's state of residence to obtain a remedy." <u>Licciardello</u>, 544 F.3d at 1288; <u>see also</u> <u>Calder v. Jones</u>, 465 U.S. 783, 790 (1984) ("An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."). Accordingly, on balance the Court finds that constitutional concerns of fair play and substantial justice are not offended by the exercise of personal jurisdiction over defendants.

### C. Forum Selection Clause:

Additionally, the Eleventh Circuit has held that under Florida law, the "due process analysis is unnecessary where a nonresident defendant has [contractually] consented to suit in a forum," as long as the requirements of Florida's long-arm statute have also been satisfied. <u>Alexander Proudfoot Co. World Headquarters L.P. v. Thayer</u>, 877 F.2d 912, 921 (11th Cir. 1989) (citing <u>Burger King</u>, 471 U.S. at 472-73 n.14). The general principles concerning forum selection clauses were set forth in <u>P & S Business Machs., Inc. v. Canon USA, Inc.</u>, 331 F.3d 804 (11th Cir. 2003).

The Titan Agreement, which contains language to supercede prior agreements between the parties, contains an express forum

selection clause. (See Doc. #60-4.) Clear, strong language "dictat[ing] an exclusive forum for litigation under the contract," such as that used in the Titan Agreement, demonstrates the mandatory nature of the forum selection clause in question. Ocwen Orlando Holdings Corp. v. Harvard Property Trust, LLC, No. 07-13920, 2008 WL 2002513, at *1 (11th Cir. May 12, 2008) (quoting Global Satellite Commun. Co. v. Starmill U.K. LTD, 378 F.3d 1269, 1272 (11th Cir. 2004)); see also Snapper, Inc. v. Redan, 171 F.3d 1249, 1262 n.24 (11th Cir. 1999).

"[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court." Proudfoot, 877 F.2d at 921 (quoting Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 704 (1982)). Defendants have never claimed that the Titan Agreement, which superceded prior agreements, was negotiated and signed under duress or is patently unreasonable. See Proudfoot, 877 F.2d at 921 ("The enforcement of an agreement conferring jurisdiction does not offend due process where the provision is freely negotiated and not unreasonable or unjust."). Accordingly, "having contractually waived [their] due process right not to be subjected to suit in a forum without sufficient contacts, [defendants] cannot now assert that personal jurisdiction in Florida violates [their] due

process rights." Id. Upon examination of the record, the Court concludes that the Titan Agreement contains a valid and enforceable mandatory forum selection clause specifying that this action be brought in federal court in Florida. Upon consideration of the forum selection clause and, alternatively, defendants' "minimum contacts" with Florida, it is clear that the Court may exercise personal jurisdiction over each of the defendants.

## IV.

Defendants' alternative motion, for a change of venue to the United States District Court for the Eastern District of Michigan, is properly before the Court. A case may be dismissed under forum non conveniens and venue may be transferred at the sound discretion of the Court pursuant to FED. R. CIV. P. 12(b)(3) and 28 U.S.C. § 1404(a), for the convenience of the parties, the convenience of the witnesses, and in the interest of justice. Plaintiff's choice of forum is the Middle District of Florida. In the Eleventh Circuit there is a "strong presumption against disturbing plaintiffs' initial forum choice." SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A., 382 F.3d 1097, 1100 (11th Cir. 2004). Preference is granted to the plaintiff's choice of forum and such choice of forum should not be disturbed

unless it is clearly outweighed by other considerations. See, e.g., Robinson, 74 F.3d at 260.

Upon review of the motion and the affidavit filed by defendant Farrah under the original Complaint, (Doc. #23), the Court finds that defendants have failed to meet their burden of proof under § 1404(a) to demonstrate that they are entitled to a transfer of venue. Farrah and defendants have failed to sufficiently demonstrate that their concerns "clearly outweigh" plaintiff's choice of forum in this case or advance the interest of justice. Accordingly, defendants' motion to transfer venue is denied.

Accordingly, it is now

**ORDERED**:

Defendants William J. Farrah, Titan Polymers, LLC and The Farrah Group, LLC's Motion for Dismissal Under FED. R. CIV. P. 12(b)(2) and (3) or, in the Alternative, Motion to Transfer Venue (Doc. #65) is **DENIED.**

**DONE AND ORDERED** at Fort Myers, Florida, this __23rd__ day of January 2009.

JOHN E. STEELE
United States District Judge

Copies:
Counsel of record

-24-